FILED

2014 DEC -3 PM 4: 25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2014 Grand Jury

UNITED STATES OF AMERICA,

               Plaintiff,

          v.

MANUEL LARRY JACKSON,
  aka "Cricket,"
VICTOR BARRIOS,
  aka "Grizzly,"
  aka "Ghost,"
MARK ANTHONY JOHNSON,
  aka "Boo Boo,"
FRANCISCO HUERTA,
  aka "Cisco,"
FERNANDO AMEZCUA,
  aka "Solo,"
ART HERNANDEZ,
  aka "Comamo,"
JESUS DORAN,
  aka "Creeper,"
JOSE LUIS LIZARRAGA,
  aka "Night Owl,"
LUCIO SANDOVAL,
  aka "Bouncer,"
JERRY SALAS,
  aka "Indio"
  aka "Injen,"
RAYMOND MONTES,
  aka "Baby,"
MIGUEL MORALES,
  aka "Moreno,"
OSCAR FLORES,
  aka "Zinc,"

CR No. **CR 14 - 0684**

I N D I C T M E N T

[18 U.S.C. § 1962(d): Racketeer
Influenced and Corrupt
Organizations Conspiracy; 18
U.S.C. § 1959: Violent Crime in
Aid of Racketeering; 21 U.S.C.
§ 846: Conspiracy to Distribute
Controlled Substances; 21 U.S.C.
§§ 841(a)(1), 841(b)(1)(A),
841(b)(1)(B): Possession with
Intent to Distribute and
Distribution of Controlled
Substances; 18 U.S.C.
§§ 924(c)(1)(A), (c)(1)(B),
(j)(1): Use of a Firearm During
and in Relation to, and
Possession of a Firearm in
Furtherance of, a Crime of
Violence and a Drug Trafficking
Crime; 18 U.S.C. § 922(g)(1):
Felon in Possession of a Firearm
and Ammunition; 18 U.S.C. § 2:
Aiding and Abetting; 18 U.S.C.
§ 1963: Criminal Forfeiture; 21
U.S.C. § 853: Criminal
Forfeiture; 18 U.S.C. § 924(d),
26 U.S.C. § 5872, and 28 U.S.C.
§ 2461(c): Criminal Forfeiture]

1  DANIEL MIRANDA,
       aka "Raccoon,"
2  GILBERT LOPEZ,
       aka "Beto,"
3  MARIO WETMORE,
       aka "Lil Mario,"
4  ENRIQUE MARTINEZ,
       aka "Butter,"
5  ASHLEY PAGAN,
       aka "Crook,"
6  JESUS IBARRA
       aka "Jesse,"
7  BRYAN SALGADO,
       aka "Veneno,"
8  ALBERT MORALES,
       aka "Lil Bronco,"
9  DAVID SMITH,
       aka "Crow,"
10      aka "Negro,"
   JOEL MATTHEW MONARREZ,
11      aka "Vago,"
   LUIS ORTIZ,
12      aka "Face,"
        aka "Huero,"
13 JOSE HERNANDEZ,
       aka "Israel Urbina,"
14 JESUS RODRIGUEZ,
        aka "Slave,"
15 PEDRO RUIZ,
       aka "Minor,"
16 JUAN CARLOS GONZALEZ,
       aka "Fat Ass,"
17 DESIREE RIVERA,
   ALEX PADILLA,
18      aka "Flaco,"
   DAVID NUNEZ,
19      aka "Gordo,"
   MARIO LIZARRAGA,
20 LEON ABEL GONZALEZ,
   JAVIER GUTIERREZ,
21 GELACIO TREJO,
   PEDRO GUZMAN,
22      aka "Moreno,"
        aka "Negro,"
23 MONIQUE CASTILLO,
   DINO AGUILAR,
24      aka "Sneaky,"

25              Defendants.

26

27     The Grand Jury charges:

28

2

1    GENERAL ALLEGATIONS

2  A.    THE ENTERPRISE

3        1.   At all times relevant to this indictment, defendants

4  MANUEL LARRY JACKSON, also known as ("aka") "Cricket"

5  ("JACKSON"), VICTOR BARRIOS, aka "Grizzly," aka "Ghost"

6  ("BARRIOS"), MARK ANTHONY JOHNSON, aka "Boo Boo" ("JOHNSON"),

7  FRANCISCO HUERTA, aka "Cisco" ("HUERTA"), FERNANDO AMEZCUA, aka

8  "Solo" ("AMEZCUA"), ART HERNANDEZ, aka "Comamo"

9  ("A. HERNANDEZ"), JESUS DORAN, aka "Creeper" ("DORAN"), JOSE

10 LUIS LIZARRAGA, aka "Night Owl" ("J. LIZARRAGA"), LUCIO

11 SANDOVAL, aka "Bouncer" ("SANDOVAL"), JERRY SALAS, aka "Indio,"

12 aka "Injen" ("SALAS"), RAYMOND MONTES, aka "Baby" ("MONTES"),

13 MIGUEL MORALES, aka "Moreno" ("M. MORALES"), OSCAR FLORES, aka

14 "Zinc" ("FLORES"), DANIEL MIRANDA, aka "Raccoon" ("MIRANDA"),

15 GILBERT LOPEZ, aka "Beto" ("LOPEZ"), MARIO WETMORE, aka "Lil

16 Mario" ("WETMORE"), ENRIQUE MARTINEZ, aka "Butter" ("MARTINEZ"),

17 ASHLEY PAGAN, aka "Crook" ("PAGAN"), JESUS IBARRA, aka "Jesse"

18 ("IBARRA"), BRYAN SALGADO, aka "Veneno" ("SALGADO"), ALBERT

19 MORALES, aka "Lil Bronco" ("A. MORALES"), DAVID SMITH, aka

20 "Crow," aka "Negro" ("SMITH"), JOEL MATTHEW MONARREZ, aka "Vago"

21 ("MONARREZ"), LUIS ORTIZ, aka "Face," aka "Huero" ("ORTIZ"),

22 JOSE HERNANDEZ, aka "Israel Urbina" ("J. HERNANDEZ"), JESUS

23 RODRIGUEZ, aka "Slave" ("RODRIGUEZ"), PEDRO RUIZ, aka "Minor"

24 ("RUIZ"), JUAN CARLOS GONZALEZ, aka "Fat Ass" ("J. GONZALEZ"),

25 DESIREE RIVERA ("RIVERA") (collectively, the "defendants"), and

26 others known and unknown to the Grand Jury, were members and

27 associates of the Big Hazard, or Hazard Grande, street gang, a

28 criminal organization whose members and associates engaged in,

1  among other things, acts involving murder, robbery, and

2  extortion; and acts involving the possession with intent to

3  distribute, conspiracy to distribute, and the distribution of

4  controlled substances.  At all times relevant to this

5  Indictment, the Hazard criminal organization ("Hazard") operated

6  within the Central District of California and elsewhere.

7       2.   The Hazard gang is a multi-generational gang that

8  originated in the early 1940s and claimed a territory in the

9  East Los Angeles Area, which grew to include the Ramona Gardens

10  Housing Project, public housing built in the 1950s.  Hazard

11  derived its name from a park in the neighborhood the gang

12  controlled, Hazard Park, and uses Ramona Gardens as a base of

13  operations.  Hazard has a current estimated membership of

14  approximately 350 individuals.  The Hazard gang is part of a

15  network of Latino gangs in the greater Los Angeles area

16  controlled by senior gang members who are also members and

17  associates of an organization known as the "Mexican Mafia" or

18  "La Eme."  The Mexican Mafia is an organized group of

19  individuals that controls the narcotics trafficking and other

20  criminal activities within California's penal system and,

21  through that control, controls the activities of Latino gangs,

22  like the Hazard gang, on the streets.  Hazard, including its

23  leaders, members, and associates, constitutes an "enterprise,"

24  as defined by Title 18, United States Code, Section 1961(4),

25  that is, a group of individuals associated in fact, although not

26  a legal entity, which is engaged in, and the activities of which

27  affect, interstate and foreign commerce.  Hazard constitutes an

28  ongoing organization whose members and associates function as a

1    continuing unit for a common purpose of achieving the objectives

2    of the enterprise.

3    B.    PURPOSES OF THE ENTERPRISE

4         3.    The purposes of the Hazard enterprise include, but are

5    not limited to, the following:

6             a.    Enriching leaders of Hazard (including those who

7    are members and associates of the Mexican Mafia) through the

8    remittance of the proceeds generated as a result of Hazard's

9    criminal activities (referred to as "taxes"), including drug

10   sales, extortion, and robbery; enriching leaders of Hazard

11   (including those who are members and associates of the Mexican

12   Mafia) through the collection and remittance of "taxes"

13   generated by the criminal activities of other Latino street

14   gangs falling under the authority of Hazard's leaders; promoting

15   Hazard leaders' criminal reputation among other Latino gangs in

16   Southern California and inside of state and federal prisons;

17   carrying out Hazard leaders' orders against rival gang members

18   and enemies; and enhancing Hazard's reputation by promoting the

19   criminal reputation of its members and associates.

20            b.    Enriching members and associates of Hazard

21   through, among other things, the control of and participation in

22   the distribution of various controlled substances within

23   Hazard's territory, as well as by engaging in robberies of and

24   car thefts from local residents.

25            c.    Maintaining Hazard's control and authority over

26   its territory, often through threats, intimidation, hate crimes,

27   and acts of violence committed against local residents and rival

28   gangs.

1            d.     Violently retaliating against rival gang members

2 who challenge Hazard's authority or who fail to pay debts owed

3 to Hazard members and associates.

4            e.    Promoting and enhancing the power and authority

5 of the Hazard gang and associated Latino gangs operating under

6 Hazard's leadership.

7            f.    Exposing and punishing Hazard members and

8 associates who are perceived as violating Hazard's rules.

9            g.    Exposing and punishing potential witnesses to

10 crimes committed by Hazard members and associates who are

11 suspected of cooperating with law enforcement or otherwise

12 "disrespecting" Hazard.

13 C.    THE CONDUCT OF THE ENTERPRISE

14      4.    In order to enforce control over its territory, Hazard

15 uses methods to identify its territory and to intimidate other

16 gangs and the local community by indicating that specific

17 territory is controlled by Hazard.  Such methods include the use

18 of graffiti to mark the area controlled by the gang.  The gang

19 graffiti is intended to intimidate rival gangs, drug dealers,

20 and neighborhood residents, and to establish that Hazard "owns"

21 the area in East Los Angeles generally between (to the North)

22 Valley Boulevard, (to the East) Indiana Street, (to the South)

23 Marengo Street, and (to the West) Cornwell and San Pablo

24 Streets.  The Hazard graffiti, also called "tags," is also

25 intended to inform other gangs and residents that the defaced

26 areas are "controlled and inhabited" by Hazard, meaning that

27 only members and associates of Hazard are allowed to sell drugs

28 and "hang out" in this territory, unless other approval is

1  received from Hazard.  Examples of common Hazard tags are,

2  "Hazard," "Big Hazard," "BH," "BH13," "Peligro," (meaning,

3  "danger" or "hazard"), and "BHR," which stands for "Big Hazard

4  Rifa," with "Rifa" being slang for "untouchable" or "we

5  control."  The graffiti creates an atmosphere of fear and

6  intimidation in the community, which allows Hazard members and

7  associates to commit various crimes without fear of being

8  reported.  Hazard members are also known to tag letters and

9  numbers of rival gangs, and then cross them out, as a warning

10  and a show of disrespect to the rival gangs, and as a way to

11  communicate among Hazard members.

12      5.   Members and associates of Hazard control that

13  territory by, among other things, prohibiting the sale of

14  controlled substances by individuals who are not members,

15  affiliates, or clients of Hazard; committing robberies against

16  and car thefts from local residents and unaffiliated drug

17  dealers; excluding the presence of members of rival

18  organizations through violence and the threat of violence;

19  conducting surveillance against rival gang members and members

20  of law enforcement; challenging residents and pedestrians in

21  order to determine those individuals' gang identities; and

22  harassing and intimidating African-American families living in

23  the majority Latino community that Hazard claims to control.

24      6.   In controlling Hazard territory, Hazard members and

25  associates will "brand" their criminal acts by, for example,

26  shouting references to Hazard before or during a crime;

27  demanding property or services from local residents and

28  businesses because of their Hazard membership; harassing,

1    threatening, and assaulting rival gangs or other unwanted

2    outsiders, such as African Americans and law enforcement

3    officers who enter Hazard territory.  In "branding" such acts,

4    Hazard members and associates intend to cause people to fear

5    Hazard so that Hazard can carry out its criminal goals without

6    interference.

7        7.    Members and associates of Hazard use tattoos to

8    identify themselves and display their association with the

9    Hazard enterprise.  Common Hazard gang tattoos feature the same

10   "tagging" words noted above along with the biohazard symbol.

11   Hazard gang members also wear tattoos that reflect their

12   respective cliques (or subsets of Hazard, often based on

13   geography, age range, or generational membership), which include

14   the "Jokers," "Condors," "Dirty Dogs," "Ricardo Street,"

15   "Rascals," "Tiny Jokers," "Little Diablos," and "RG Boys."

16   While cliques have their own names, each still owes ultimate

17   allegiance to Hazard, and each clique member is still considered

18   a member of the larger entity, that is, Hazard.  Hazard members

19   also utilize a hand sign to display their membership in and

20   allegiance to the gang.  This hand sign is created by extending

21   the index fingers of both hands out horizontally and touching

22   the tips together, creating a straight line, and then extending

23   both thumbs straight up in the air, creating the appearance of

24   an "H."  Hazard members and associates also use monikers, or

25   nicknames, for each other, and often members have multiple

26   monikers, some of which are secretive and kept from law

27   enforcement and the public.

28

8.   Hazard is governed by a set of unwritten rules, which are often violently enforced.  Such rules include a prohibition on any cooperation with law enforcement.  Such cooperation is punished by severe sanctions such as great bodily injury, harm to family members, or even death.  Hazard applies this rule not only to members and associates but also to non-members who reside in Hazard's territory.

9.   The Hazard gang is part of a network of Latino gangs affiliated with the Mexican Mafia.  Members of the Mexican Mafia come from the ranks of local street gangs, including the Hazard gang.  Members and associates of Hazard pay "taxes" to members and associates of the Mexican Mafia in order to maintain control over Hazard territory with the Mexican Mafia's graces and in order to assure protection for Hazard members and associates inside California's penal institutions, which are controlled by the Mexican Mafia.  Latino gang members and associates who are incarcerated in California's penal system are referred to generally as "sureños," that is, associates of the Mexican Mafia who assist in enforcing the orders of Mexican Mafia members both for their own gangs and for other gangs in Southern California. Mexican Mafia leaders issue directions and orders to sureños, including orders, which are referred to as "green lights," to kill rival gang members, gang members who have violated certain gang rules, members of law enforcement, and members of the public who are suspected of providing information to law enforcement.  Those directions and orders are to be executed by sureños, including Hazard members and associates, and are understood by Hazard members and associates as opportunities to

1    gain elevated status within the Hazard gang and the Mexican

2    Mafia, or to potentially become a "made" member of the Mexican

3    Mafia.   Members of the Hazard gang frequently incorporate the

4    number 13 in various forms (i.e., 13, X3, or XIII) in both

5    "tagging" and tattoos to demonstrate their affiliation with and

6    loyalty to the Mexican Mafia ("m" being the 13th letter in the

7    alphabet) and to signify that the gang has sureño (i.e.,

8    Southern California) affiliation and loyalty.

9         10.   The Mexican Mafia has established rules that govern

10   criminal activity committed by sureño gang members and

11   associates, including criminal activity committed by Hazard.   In

12   this regard, the Mexican Mafia requires Hazard to adhere to

13   protocols in connection with the commission of violent attacks,

14   narcotics trafficking, and murders, including the issuance of

15   "green light" authorizations for murder.   Failure to adhere to

16   Mexican Mafia rules can lead to the issuance of a "green light"

17   directing an attack on the offending gang member or associate,

18   or the requirement that money be paid.   "Green lights" are also

19   frequently issued in retaliation for perceived acts of

20   "disrespect" to a Mexican Mafia leader; to punish the

21   unauthorized collection of "tax" payments in a neighborhood

22   controlled by a street gang, such as the Hazard gang; and to

23   sanction individuals who traffic in narcotics without a gang's,

24   such as Hazard's, authorization or without paying the required

25   "tax" to a gang, like the Hazard gang, and the Mexican Mafia.

26        11.   Individuals become leaders within Hazard by "putting

27   in work," that is, committing crimes in order to advance the

28   reputation and profits of the gang, with violent acts earning

the most respect and quickest advancement in seniority within
the organization.  However, leadership and status sometimes
change within Hazard as a result of internal conflicts and power
struggles.  Those seeking leadership positions are said to
"politic," meaning that they are attempting to gain favor with
other Hazard members and associates in order to attain a
position of authority and responsibility in Hazard and the
Mexican Mafia.

        12.  Leaders of Hazard recruit and initiate juveniles into
the gang and direct them to commit acts of violence and drug-
trafficking crimes on behalf of Hazard.  New members ordinarily
are then "jumped" into the gang, which typically requires that
the new members be physically beaten by other gang members and
associates.  The new member is then expected to "put in work" or
go on "missions" for Hazard, which includes distributing
narcotics, storing firearms, seeking out and assaulting rival
gang members, acting as a lookout to alert other gang members to
the presence of law enforcement, and "tagging" areas with
Hazard-related symbols.  The older members and associates of
Hazard generally instruct younger members and associates to
commit crimes on behalf of Hazard, based on the commonly held
belief among Hazard members and associates that the younger
members and associates, who are often juveniles, will receive
lenient sentences for such crimes, including the possession of
firearms, the possession of narcotics for sale, and the
commission of violent assaults on rival gang members, if
arrested and prosecuted.

13.   Defendant JACKSON and unindicted co-conspirators Adolofo "Champ" Reynoso, David "Smilon" Gallardo, Jose "Joker" Gonzalez, and Daniel "Danny Boy" Piña, are members of Hazard who are also "made" members of the Mexican Mafia.  Reynoso, Gallardo, Gonzalez, and Piña are all serving life sentences in prison, and, accordingly, rely on members and associates outside of prison to carry out their directives and to generate funds for their use through the collection of "taxes." Defendant JACKSON, who was most recently released from prison in 2011, controls a territory in East Los Angeles on behalf of the Mexican Mafia that includes the Hazard gang territory, and extends to neighboring Latino gangs, including the State Street, Eastlake, KAM, Cuatro Flats, Breed Street, and Burlington Locos street gangs.  While each of these gangs has its own individual leadership structure and engages in criminal activities within its territory, their members are associates within the Hazard Enterprise who collect "taxes" and commit crimes at defendant JACKSON's instruction. Because of defendant JACKSON's power as a Mexican Mafia member and his connection to Hazard, Hazard members and associates have unique authority to engage in criminal activities, such as the sales of drugs and firearms outside of Hazard territory without the risk of violent reprisal that Latino gang members ordinarily would suffer for engaging in such criminal activities in territories controlled by other Latino gangs.

14.   As the shot caller of the Hazard gang, defendant BARRIOS communicated with defendant JACKSON directly, issued directives to Hazard members and associates, and coordinated the

1  enforcement of defendant JACKSON's orders, including overseeing
2  the sales of drugs and violent conduct within Hazard territory.
3  Defendant BARRIOS also controlled and enforced the collection of
4  "tax" payments from all Latino gangs under defendant JACKSON's
5  control.  Leaders of those gangs turned to defendant BARRIOS, by
6  virtue of defendant BARRIOS acting as a surrogate for defendant
7  JACKSON.

8      15.  Hazard is continually engaged in the distribution of
9  methamphetamine, phencyclidine ("PCP"), cocaine, cocaine base in
10  the form of crack cocaine, heroin, and other controlled
11  substances.  Members and associates of Hazard are actively
12  involved in distributing those drugs in the neighborhoods
13  controlled by Hazard.  In particular, Hazard leaders obtain
14  drugs and control the distribution of drugs by providing
15  "street-level" distribution amounts of drugs to numerous members
16  and associates in the area controlled by Hazard.  In order to
17  sell drugs within Hazard territory, one must be either a member
18  or an associate or otherwise have permission from, and pay
19  "taxes" or "rent" to, Hazard.

20     16.  Drug sales comprise the majority of the revenue
21  generated by Hazard and many Hazard members and associates work
22  together in order to successfully operate their drug trafficking
23  monopoly in the territory controlled by Hazard.  The ways in
24  which they do so include by: selling drugs to other members of
25  Hazard for further distribution; conducting counter-surveillance
26  against law enforcement and rivals during Hazard's drug sales;
27  sharing drug sales so that multiple members and associates of
28  Hazard can profit off of a sale to a single customer; referring

1   drug customers to other members and associates of Hazard when

2   certain members and associates are sold out of drugs; operating

3   drug stash houses and/or drug sales locations for and with other

4   members and associates of Hazard; transporting drugs and drug

5   proceeds for Hazard members and associates; "fronting" or

6   providing drugs to other members and associates of Hazard with

7   no upfront cost in order to recoup payment after drugs are sold;

8   and using common code words to disguise the sale of various

9   drugs in various quantities.

10       17.   To support their narcotics trafficking and to enforce

11   their control of their claimed "territory," Hazard members and

12   associates maintain a ready supply of firearms.   They also sell

13   these weapons for profit, using the proceeds from such sales to

14   purchase narcotics and additional firearms, or to pay the

15   required "taxes" for Hazard.   Firearms are also possessed in

16   order to increase the status and intimidation level of the

17   individual Hazard member or associate who possesses the firearm

18   and to enhance the culture of fear created by Hazard as a whole.

19   Such weapons are frequently stolen or unregistered, so that

20   their use cannot be readily connected to the member or associate

21   who either used the weapon or obtained it.   Weapons often are

22   discarded or destroyed after being used to commit acts of

23   violence on behalf of the organization.   Therefore, Hazard

24   leaders need to maintain a consistent source of supply for

25   additional unregistered or non-traceable firearms.

26       18.   Hazard is highly aware of the activities of law

27   enforcement.   Hazard members and associates constantly

28   communicate with each other regarding law enforcement activity

and regarding who may be cooperating with law enforcement. For example, Hazard members and associates utilize cellular telephones to notify those connected to Hazard that law enforcement officers are inside Hazard's territory. Further, Hazard members and associates assault and discipline other members and associates for even talking to law enforcement about Hazard activity or getting their names on law enforcement reports, referred to as "paperwork." Hazard also relies on female and juvenile associates to carry out gang activity, such as transporting drugs, in an effort to secretly facilitate Hazard's operations and because of the belief of Hazard members and associates that females and youth draw less suspicion from law enforcement than do adult males.

19. Hazard members and associates regularly exploit prison visits, telephone calls made by inmates, policies concerning letter-communications between inmates and attorneys, and prison monetary accounts maintained by inmates in order to coordinate criminal activity and store income derived from narcotics trafficking and other crimes of the enterprise, so as to promote the criminal enterprise and direct the operation of Hazard from within jails and prisons. Mexican Mafia leaders also require regular payments from Hazard members and associates who are incarcerated.

20. Hazard also controls the activities of its members and associates, enforces its authority, and metes out internal discipline within Hazard by killing, attempting to kill, conspiring to kill, assaulting, and threatening its own members and associates and other Latino gang members who fail to pay

debts owed to the enterprise or who present a threat to the enterprise.  Hazard members and associates frequently seek authority for these attacks from Mexican Mafia members and associates, obtaining "green lights" to carry out murders and assaults.  Hazard members and associates typically continue to plan and execute crimes even after they are arrested and incarcerated.

D.   THE MEANS AND METHODS OF THE ENTERPRISE

    21.   The means and methods by which the defendants and their associates conduct and participate in the conduct of the affairs of Hazard include the following:

        a.   Members and associates of Hazard commit, conspire, attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal operation, including assaults, murders, acts of intimidation, and threats of violence directed against rival gang members, neighborhood residents, and witnesses in criminal cases, and to violently discipline insubordinate members of the enterprise.

        b.   Members and associates of Hazard promote a climate of fear, particularly among rival gang members and unaffiliated local residents in and near Hazard territory, through acts of violence and threats to commit acts of violence.

        c.   Members and associates of Hazard engage in drug trafficking, gun trafficking, car theft, robbery, and extortion to generate income.

        d.   Members and associates of Hazard frequently engage in the aforementioned criminal activity in the presence of other Hazard members and/or associates in order to enhance

the status within Hazard of those affirmatively conducting the criminal acts.

       e.   Members and associates of Hazard protect and strengthen Hazard's standing by following the direction of Mexican Mafia leadership; by corresponding with members and associates of Hazard and the Mexican Mafia through prison visits, telephone calls, and written correspondence; by remitting portions of drug sales, robberies, and other illegal activities to Mexican Mafia members and associates; and by carrying out violent acts against targets designated by Mexican Mafia members and associates.

COUNT ONE

[18 U.S.C. § 1962(d)]

Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.  THE CONSPIRACY

1.  Beginning on a date unknown, and continuing to on or about December 3, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants JACKSON, BARRIOS, JOHNSON, HUERTA, AMEZCUA, A. HERNANDEZ, DORAN, J. LIZARRAGA, SANDOVAL, SALAS, MONTES, M. MORALES, FLORES, MIRANDA, LOPEZ, WETMORE, MARTINEZ, PAGAN, IBARRA, SALGADO, A. MORALES, SMITH, MONARREZ, ORTIZ, J. HERNANDEZ, RODRIGUEZ, RUIZ, J. GONZALEZ, RIVERA, and others known and unknown to the Grand Jury, being persons employed by and associated with the Hazard criminal enterprise, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

a.  Multiple acts involving murder, committed in violation of California Penal Code Sections 31, 182, 187, 189, and 664;

b.    Multiple acts involving robbery, committed in violation of California Penal Code Sections 31, 182, 211, and 664;

c.    Multiple acts involving extortion, committed in violation of California Penal Code Sections 31, 182, 520, and 664;

d.    Offenses involving the possession with intent to distribute, distribution of, and conspiracy to distribute, controlled substances, including heroin, methamphetamine, PCP, cocaine, and cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

e.    Multiple acts indictable under Title 18, United States Code, Section 1951 (relating to interference with commerce through robbery and extortion).

2.    It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

B.    MEANS OF THE CONSPIRACY

The objects of the conspiracy were to be accomplished in substance as follows:

1.    Defendant JACKSON would exercise leadership over the Hazard Enterprise; collect "tax" payments from its members and associates, including drug traffickers operating in Hazard territory; remit "tax" payments to incarcerated Mexican Mafia members; expand his (and Hazard's) drug and criminal territories; engage in large-scale drug transactions; and

1  authorize certain criminal activities committed by Hazard

2  members and associates.

3       2.    Defendants BARRIOS, JOHNSON, HUERTA, AMEZCUA,

4  A. HERNANDEZ, DORAN, J. LIZARRAGA, SANDOVAL, SALAS, M. MORALES,

5  FLORES, MIRANDA, MARTINEZ, PAGAN, and A. MORALES, as senior

6  Hazard members, would support defendant JACKSON's leadership

7  over Hazard and exercise their own leadership over Hazard by

8  issuing orders from defendant JACKSON; collecting "tax" payments

9  from Hazard-affiliated drug dealers and from other Latino gang

10 members falling under the control of defendant JACKSON and

11 remitting "tax" payments to defendant JACKSON; meeting with

12 leaders of other Latino gang members to expand defendant

13 JACKSON's control (and Hazard's power); supplying firearms and

14 controlled substances to Hazard-affiliated drug dealers for

15 further distribution; commanding assaults and attacks against,

16 and conspiring to murder, enemies of Hazard; and antagonizing

17 and targeting for violence rival gang members and individuals

18 suspected of cooperating with law enforcement.

19      3.    Defendants MONTES, LOPEZ, WETMORE, IBARRA,

20 J. HERNANDEZ, RODRIGUEZ, and RIVERA, as associates of Hazard and

21 members of other Latino street gangs operating within Hazard or

22 at the direction of defendant JACKSON, would associate with

23 Hazard in order to enrich, promote, and enhance defendant

24 JACKSON by, among other things, helping Hazard members and

25 associates obtain and sell drugs and guns and extort victims;

26 would make "tax" payments to and collect "tax" payments for

27 Hazard; and would carry out Hazard orders to commit acts of

28 violence.

4.      Defendants SALGADO, SMITH, MONARREZ, ORTIZ, RUIZ, and
J. GONZALEZ, as younger Hazard gang members, would act as "foot
soldiers" for Hazard by committing crimes for the enterprise,
including crimes involving the possession of firearms; would
agree to assault rival gang members and enemies of Hazard; would
engage in drug sales; would collect "tax" payments from Hazard-
affiliated gangs and gang members; would commit violent crimes
against civilians within Hazard territory; would commit violent
crimes against rival gang members in prison and jail; and would
represent Hazard's interests while in prison and jail.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the
objects of the conspiracy, on or about the following dates
defendants JACKSON, BARRIOS, JOHNSON, HUERTA, AMEZCUA,
A. HERNANDEZ, DORAN, J. LIZARRAGA, SANDOVAL, SALAS, MONTES,
M. MORALES, FLORES, MIRANDA, LOPEZ, WETMORE, MARTINEZ, PAGAN,
IBARRA, SALGADO, A. MORALES, SMITH, MONARREZ, ORTIZ,
J. HERNANDEZ, RODRIGUEZ, RUIZ, J. GONZALEZ, RIVERA, and others
known and unknown to the Grand Jury, committed various overt
acts within the Central District of California, and elsewhere,
including but not limited to the following:

1.      On February 15, 2007, while in Hazard territory,
defendants ORTIZ and SMITH assaulted a non-gang member and
claimed "Hazard" during assault.

2.      On June 14, 2007, defendant FLORES possessed
methamphetamine for sale in Hazard territory.

3.      On November 1, 2008, defendant FLORES, in Hazard
territory, possessed methamphetamine for sale, along with

1   ammunition, and utilized a live-feed surveillance camera

2   connected to a monitor inside of his residence so that he could

3   be alerted to the presence of drug customers and approaching law

4   enforcement.

5       4.   On July 26, 2008, defendant AMEZCUA and other Hazard

6   members extorted money from victims who had allowed law

7   enforcement to enter their property to search for a Hazard

8   member who fled to the property without the owner-victim's

9   permission.

10      5.   On December 23, 2008, a Hazard member, while in Hazard

11  territory, and using racial slurs, threatened a Ramona Gardens

12  resident.

13      6.   In April 2009, using coded language in a letter sent

14  from an Administrative Maximum Facility Penitentiary in

15  Florence, Colorado ("Florence ADX"), defendant JACKSON thanked

16  defendant JOHNSON for sending a portion of the "tax" payments to

17  defendant JACKSON on behalf of Hazard.

18      7.   In June 2009, Hazard members vandalized a Ramona

19  Gardens building and threatened residents by spray-painting

20  "Vario BHR no blacks."

21      8.   In July 2009, using coded language in a letter sent

22  from Florence ADX, unindicted co-conspirator Reynoso thanked

23  defendant JOHNSON for sending a portion of the "tax" payments to

24  Reynoso on behalf of Hazard.

25      9.   On September 10, 2010, defendant SMITH and Hazard

26  members robbed non-gang members in Hazard territory.

27      10.  On September 29, 2010, defendant FLORES utilized a

28  live-feed surveillance camera connected to a monitor inside of

his residence so that he could be alerted to the presence of drug customers and approaching law enforcement.

11.  On September 2, 2010, defendant JOHNSON collected from a non-Hazard gang member what defendant JOHNSON believed was $70,000, as payment for a drug deal.

12.  On September 2, 2010, defendant JOHNSON attempted to assault a non-Hazard gang member who provided defendant JOHNSON with $4,653 but represented it to be $70,000, as payment for a drug deal.

13.  In October 2010, while in Florence ADX, unindicated co-conspirator Gallardo provided a phone number for defendant A. HERNANDEZ to someone Gallardo believed to be looking for a drug source of supply but who was actually a confidential informant who provided information to law enforcement (a "CI").

14.  On October 23, 2010 and again on December 20, 2010, using coded language in a telephone conversation, unindicted co-conspirator Gallardo notified defendant A. HERNANDEZ that someone would be contacting defendant A. HERNANDEZ to set up drug transactions.

15.  On November 13, 2010, defendant SANDOVAL, in Hazard territory, threatened to kill non-Hazard members for cooperating with law enforcement (i.e., being "rats"), indicated that Hazard owned the neighborhood, and stated that, even if he went to jail, he would coordinate an assault on the victims through other Hazard members.

16.  On November 29, 2010, defendants ORTIZ and SMITH drove through Hazard territory in a stolen car.

17. On March 3, 2011, defendant SANDOVAL, in Hazard territory, sold approximately 55.2 grams of methamphetamine for $2,500 to a CI and explained that, if the CI sold drugs in Hazard territory, the CI would be required to pay $100 a month in "tax."

18. On April 26, 2011, defendant A. HERNANDEZ met with a CI (who defendant A. HERNANDEZ believed had been directed to contact defendant A. HERNANDEZ by unindicted co-conspirator Gallardo) to discuss future drug transactions and "tax" payments, wherein defendant A. HERNANDEZ agreed to sell the CI methamphetamine at a price of $600 per ounce, with $50 of the payment to be paid as a "tax" to Gallardo at Florence ADX.

19. On May 2, 2011, defendants SANDOVAL, JOHNSON, and co-conspirator Monique Castillo, in Hazard territory, sold approximately 78.7 grams of methamphetamine for $3,600 to a CI.

20. On May 5, 2011, defendant A. HERNANDEZ, in Hazard territory, provided two samples of methamphetamine to a CI and explained that one sample was priced at $850 per ounce, the other sample was priced at $700 per ounce, and that when ordering from defendant A. HERNANDEZ over the telephone, the CI should ask for the number of ounces by referencing "points on the game."

21. In May 2011, a Hazard member, using racial slurs, threatened a Ramona Gardens resident.

22. On May 17, 2011, defendants JOHNSON and A. HERNANDEZ sold approximately 84.2 grams of methamphetamine for $2,550 to a CI.

24

23.  On June 9, 2011, defendant J. GONZALEZ, in Hazard territory, sold PCP for $100 to a CI and advised the CI that 32 ounces of PCP would cost $5,000.

24.  On June 16, 2011, defendant A. HERNANDEZ and co-conspirator Javier Gutierrez ("Gutierrez") sold approximately 84.1 grams of methamphetamine for $2,550 to a CI, and defendant A. HERNANDEZ collected $150 from the CI on behalf of Hazard.

25.  On June 23, 2011, defendants PAGAN and J. GONZALEZ, in Hazard territory, sold PCP for $40 to a CI.

26.  On July 21, 2011, defendant A. HERNANDEZ and co-conspirator Leon Able Gonzalez ("L. Gonzalez") sold approximately 84.4 grams of methamphetamine for $2,500 to a CI.

27.  On July 23, 2011, using coded language, defendant JOHNSON told a CI that defendant JOHNSON would collect "tax" payments on behalf of Hazard and that defendant JACKSON should expand Hazard's "tax" collection to other gangs' territory.

28.  On August 11, 2011, defendant J. GONZALEZ, in Hazard territory, explained to a CI that defendant PAGAN handled the sale of larger quantities of PCP and that defendant J. GONZALEZ worked with defendant PAGAN and handled the sale of smaller quantities of PCP.

29.  On August 25, 2011, defendant HUERTA, in Hazard territory, sold PCP and approximately 3.9 grams of methamphetamine for $220 to a CI and instructed the CI on how to weigh the drugs for distribution to customers.

30.  On August 26, 2011, defendant JACKSON, in Hazard territory, collected a $300 "tax" payment from a CI.

31.  On September 1, 2011, defendant A. HERNANDEZ and co-conspirator Gutierrez sold approximately 54.9 grams of methamphetamine for $1,700 to a CI, and defendant A. HERNANDEZ told the CI that defendant A. HERNANDEZ had access to firearms for sale.

32.  On September 7, 2011, defendant HUERTA, in Hazard territory, sold approximately 3.6 grams of methamphetamine for $200 to a CI.

33.  On September 12, 2011, defendant A. HERNANDEZ, using coded language in a telephone conversation, told a CI that he had access to a firearm for sale for $500, and defendant A. HERNANDEZ disclosed that the background of the firearm was unknown, meaning it could have been used in a crime.

34.  On September 13, 2011, defendant A. HERNANDEZ sold a 9mm Parabellum caliber semi-automatic pistol, Beretta model 92F, with an obliterated serial number, to a CI for $500.

35.  On September 20, 2011, defendant JACKSON, using coded language in a telephone conversation, told a CI that he was getting a supply of drugs but that he did not want to talk on the phone about it.

36.  On September 22, 2011, defendant JACKSON, using coded language in a telephone conversation, told a CI that he was sending someone to meet with the CI on defendant JACKSON's behalf to discuss drug transactions.

37.  On September 22, 2011, defendant WETMORE met with a CI, believing the CI to be a potential drug customer of defendant JACKSON, and explained, using coded language, that

1  defendant JACKSON would sell a half-pound of methamphetamine for

2  $5,000.

3      38.  On September 22, 2011, defendant WETMORE collected a

4  $500 "tax" payment from a CI on behalf of Hazard.

5      39.  On October 1, 2011, defendant A. HERNANDEZ, using

6  coded language in a telephone conversation, told a CI that he

7  had access to two M16 assault rifles for sale at a price of

8  $1,100 each.

9      40.  On October 13, 2011, defendant A. HERNANDEZ and

10 co-conspirator L. Gonzalez sold approximately 55.6 grams of

11 methamphetamine for $1,700 to a CI, and defendant A. HERNANDEZ

12 collected a $200 "tax" from the CI on behalf of Hazard.

13     41.  On October 14, 2011, defendant WETMORE, in Hazard

14 territory, collected a $200 outstanding drug debt from a CI.

15     42.  On October 19, 2011, defendant WETMORE sold

16 approximately 2.9 grams of methamphetamine for $180 to a CI and

17 told the CI that he would return with an additional nine grams

18 of methamphetamine.

19     43.  On October 25, 2011, defendant HUERTA, in Hazard

20 territory, sold approximately 6.8 grams of methamphetamine for

21 $270 to a CI.

22     44.  On October 28, 2011, defendant JOHNSON, using coded

23 language in a telephone conversation, discussed the status of a

24 Hazard member who testified ("ratted") against another Hazard

25 member.

26     45.  On November 2, 2011, defendant WETMORE, in Hazard

27 territory, sold approximately 28 grams of methamphetamine for

28 $700 to a CI.

46. On November 2, 2011, using coded language in a telephone conversation, defendant JOHNSON told a Hazard member that drug customers had picked up a supply of drugs and that defendant JOHNSON was waiting to hear if the customers approved of the quality.

47. On November 3, 2011, using coded language in a telephone conversation, defendant A. HERNANDEZ told defendant HUERTA that he had methamphetamine available, and defendant HUERTA relayed that he had customers for the methamphetamine but that the surrounding area, Hazard territory, was being monitored by law enforcement.

48. On November 5, 2011, using coded language in a telephone conversation, defendant IBARRA told defendant A. HERNANDEZ that he had two 9mm guns for sale, and defendant A. HERNANDEZ told defendant IBARRA that he had money for defendant IBARRA from a previous transaction.

49. On November 7, 2011, using coded language in a telephone conversation, defendant A. HERNANDEZ told defendant IBARRA that he wanted to buy both firearms that defendant IBARRA had for sale.

50. On November 8, 2011, defendant A. HERNANDEZ obtained two 9mm firearms from defendant IBARRA, and after the transaction, using coded language in telephone conversations, defendants A. HERNANDEZ and IBARRA discussed the condition of the firearms.

51. On November 8, 2011, defendant A. HERNANDEZ, using coded language in a telephone conversation, told a CI that he had two 9mm firearms for sale at a price of $800 each.

52.   On November 9, 2011, defendant IBARRA, using coded language in a telephone conversation, told defendant A. HERNANDEZ that he had an AK assault rifle and an SKS assault rifle for sale at $600 each.

53.   On November 9, 2011, defendant A. HERNANDEZ, using coded language in a telephone conversation, told a CI that he had access to assault rifles for sale, including one with a tripod, at $700 each.

54.   On November 9, 2011, using coded language in a telephone conversation, defendant A. HERNANDEZ told defendant IBARRA that he wanted to purchase the assault rifles defendant IBARRA had, but defendant IBARRA stated that he had already sold them to someone else.

55.   On November 10, 2011, defendant A. HERNANDEZ sold a .45 caliber Smith & Wesson pistol, model M&P 45, with serial number MPU3649, and a 9mm caliber Ruger pistol, model P94DC, with serial number 308-01436, along with two .45 caliber ammunition magazines and two 9mm ammunition magazines, to a CI for $1,600.

56.   On November 10, 2011, defendant A. HERNANDEZ and co-conspirator L. Gonzalez sold approximately 217.9 grams of methamphetamine for $6,800 to a CI, and defendant A. HERNANDEZ collected a $300 "tax" from the CI on behalf of Hazard.

57.   On November 13, 2011, defendant A. HERNANDEZ, using coded language in a telephone conversation, discussed with a Hazard associate inmate the status of a gang member, namely, whether the gang member had become a Mexican Mafia member; and

1  defendant A. HERNANDEZ relayed that he would seek clarification
2  from defendant JACKSON.

3      58.  On November 13, 2011, defendant A. HERNANDEZ, using
4  coded language in a telephone conversation, asked defendant
5  IBARRA if he had received a supply of drugs.

6      59.  On November 18, 2011, using coded language in a
7  telephone conversation, defendant DORAN, on behalf of defendants
8  JACKSON and BARRIOS, arranged a meeting with a CI to discuss
9  future drug transactions and "tax" payments.

10     60.  On November 18, 2011, defendants BARRIOS and DORAN met
11 with a CI, collected a $300 "tax" payment on behalf of Hazard,
12 discussed various neighborhoods and whether they were
13 cooperating with (meaning, paying "taxes" to) defendant JACKSON
14 and Hazard, and directed the CI to collect "taxes" from the CI's
15 neighborhood.

16     61.  On November 20, 2011, using coded language in a
17 telephone conversation, defendant A. HERNANDEZ told defendant
18 J. GONZALEZ that he was coming to Hazard territory to meet with
19 defendant J. GONZALEZ and asked if law enforcement was in the
20 area.

21     62.  On November 21, 2011, using coded language in a
22 telephone conversation, defendant A. HERNANDEZ told defendant
23 IBARRA that he had money for defendant IBARRA and defendant
24 IBARRA relayed that he had methamphetamine available.

25     63.  On November 22, 2011, using coded language in a
26 telephone conversation, defendants A. HERNANDEZ and PAGAN
27 discussed firearms for sale.

28

64. On November 23, 2011, using coded language in a telephone conversation, defendants A. HERNANDEZ and IBARRA discussed firearms, and defendant IBARRA relayed to defendant A. HERNANDEZ that he had sold the assault rifle he had, but that he had a Smith & Wesson for sale with two ammunition clips.

65. On November 23, 2011, using coded language in a telephone conversation, defendant A. HERNANDEZ told defendant PAGAN that he had a 9mm firearm for sale for $700.

66. On November 24, 2011, using coded language in a telephone conversation, defendant MARTINEZ asked defendant JOHNSON for a half-pound of methamphetamine, and defendant JOHNSON relayed that the price was $4,000.

67. On November 25, 2011, using coded language in a telephone conversation, defendant IBARRA told defendant A. HERNANDEZ that he needed payment for a prior drug debt in order to restock his drug supply.

68. On January 10, 2012, defendant JOHNSON sold approximately 1.8 grams of methamphetamine for $100 to a CI.

69. On January 24, 2012, using coded language in a telephone conversation, defendant WETMORE discussed the availability of guns and drugs with a CI.

70. On January 25, 2012, defendant J. LIZARRAGA sold approximately 13.9 grams of methamphetamine for $400 to a CI and, using coded language, told the CI that he also supplied drugs to defendants HUERTA and PAGAN.

71. On January 25, 2012, defendant JOHNSON sold approximately 6.9 grams of methamphetamine for $320 to a CI.

72. On February 16, 2012, defendant J. LIZARRAGA and co-conspirator Mario Lizarraga sold approximately 28.2 grams of methamphetamine to a CI for $800.

73. On March 20, 2012, using coded language in a telephone conversation, defendant BARRIOS told a CI that he had heroin for sale and that defendant WETMORE owed defendant JACKSON money for drugs.

74. On March 22, 2012, defendant BARRIOS, in Hazard territory, collected a $300 "tax" payment from a CI, provided the CI with a substance defendant BARRIOS represented to be heroin, told the CI that defendant BARRIOS and defendant JACKSON had methamphetamine for sale at $800 per ounce, and discussed which gangs were paying "tax" payments to Hazard.

75. On March 25, 2012, using coded language in a telephone conversation, defendant BARRIOS told a CI that he returned the heroin to the original suppliers because of its poor quality, and BARRIOS agreed to sell the CI two ounces of methamphetamine.

76. On March 31, 2012, using coded language in a telephone conversation, defendant BARRIOS told a CI that he and defendant JACKSON had two ounces of methamphetamine for sale and that defendant JACKSON was charging $1,500 for both ounces.

77. On April 4, 2012, defendants BARRIOS and JACKSON, in Hazard territory, sold a CI approximately 55.4 grams of methamphetamine for $1,500, and BARRIOS asked the CI to rob defendant WETMORE of two ounces of methamphetamine and provide one of the ounces to defendants BARRIOS and JACKSON in order to pay off a debt owed by defendant WETMORE to defendant JACKSON.

78. On April 6, 2012, defendant J. HERNANDEZ distributed cocaine in Hazard territory.

79. On April 8, 2012, using coded language in a telephone conversation, defendant BARRIOS told defendant JOHNSON that he was meeting with defendant JACKSON, and defendant JOHNSON relayed that he had "tax" money to provide to defendant JACKSON.

80. On May 13, 2012, using coded language in a telephone conversation, defendant RIVERA ordered a half-ounce of methamphetamine from defendant BARRIOS for $375, and defendant RIVERA told defendant BARRIOS that she had two firearms for sale for $500 each.

81. On May 16, 2012, defendant BARRIOS, in Hazard territory, sold approximately 54.6 grams of methamphetamine to a CI for $1,500.

82. On May 16, 2012, using coded language in a telephone conversation, defendant MONTES reported the presence of police officers in the Hazard area to defendant BARRIOS.

83. On May 16, 2012, using coded language in a telephone conversation, defendant MARTINEZ ordered methamphetamine from defendant BARRIOS.

84. On May 17, 2012, using coded language in a telephone conversation, defendants BARRIOS and RIVERA discussed the status of defendant RIVERA's drugs and gun sales, and defendant BARRIOS told defendant RIVERA to report to him when he could collect payment for drugs he previously provided to her.

85. On May 25, 2012, defendant BARRIOS, in Hazard territory, sold approximately 27.2 grams of methamphetamine for

$750 to a CI and collected a $300 "tax" from the CI on behalf of Hazard.

86.   On May 29, 2012, defendant RIVERA possessed numerous firearms for use and distribution, including a Glock model 26 9mm Luger caliber pistol, a Cobray, model M-11/NINEmm, 9mm Luger caliber pistol, a Ruger model MINI 14, .233 REM caliber rifle, along with a silencer, numerous magazines and ammunition, and digital scales used for drug distribution.

87.   On June 5, 2012, using coded language in a telephone conversation, defendant JOHNSON told defendant AMEZCUA that he would order drugs from defendant AMEZCUA before the busy Fourth of July holiday.

88.   On June 21, 2012, defendant MARTINEZ, in Hazard territory, sold approximately 6.9 grams of methamphetamine for $340 to a CI.

89.   On June 28, 2012, defendant A. MORALES, in Hazard territory, sold approximately 3.3 grams of methamphetamine for $150 to a CI and, later that day, defendant BARRIOS collected a $100 "tax" from the CI on behalf of Hazard.

90.   On July 9, 2012, defendant BARRIOS, in Hazard territory, sold approximately 24.3 grams of methamphetamine for $750 to a CI, collected a $300 "tax" from the CI on behalf of Hazard, and told the CI that he had a firearm available for trade.

91.   On August 7, 2012, defendants ORTIZ and MIRANDA fired shots in a rival gang's territory.

92.   On August 8, 2012, using coded language in a telephone conversation, defendant M. MORALES reported to defendant BARRIOS

that Hazard members disciplined an unknown male by assaulting him.

93.  On August 9, 2012, using coded language in a telephone conversation, defendant BARRIOS told defendant MONTES that he had a stolen car for sale.

94.  On August 13, 2012, using coded language in a telephone conversation, defendant BARRIOS told defendant A. MORALES that he was going to pick up a "tax" from him on behalf of Hazard.

95.  On August 14, 2012, using coded language in a telephone conversation, defendant SALAS reported to defendant BARRIOS that defendant MIRANDA had fired shots and that there was an increased presence of law enforcement.

96.  On August 15, 2012, using coded language in a telephone conversation, defendants BARRIOS and SALGADO discussed the need to avoid law enforcement in the neighborhood, and defendant SALGADO informed defendant BARRIOS that a suspected non-Hazard cooperator had been in the neighborhood; defendant BARRIOS told defendant SALGADO that defendant SALGADO and other Hazard members should have assaulted the male, reminding defendant SALGADO that one does not have to be a gang member to be disciplined for cooperating with law enforcement.

97.  On August 15, 2012, using coded language in telephone conversations, defendants BARRIOS and SALGADO discussed the current supply of drugs that defendant SALGADO was selling, and defendant BARRIOS told defendant SALGADO that he could keep $50 in profit, with the rest going to defendant BARRIOS.

98.  On August 19, 2012, using coded language in a telephone conversation, defendant AMEZCUA asked defendant BARRIOS to provide him with narcotics.

99.  On August 20, 2012, using coded language in a telephone conversation, defendants BARRIOS and M. MORALES discussed the status of certain Hazard members, and defendant M. MORALES advised defendant BARRIOS that he should not talk to Hazard members from jail in order to avoid detection by law enforcement and that defendant BARRIOS should rely on the younger members to carry out Hazard's work.

100.  On August 20, 2012, using coded language in a telephone conversation, defendant MONARREZ ordered cocaine from defendant BARRIOS.

101.  On August 22, 2012, using coded language in a telephone conversation, defendant A. MORALES ordered methamphetamine from defendant BARRIOS.

102.  On August 22, 2012, using coded language in a telephone conversation, defendant M. MORALES ordered heroin from defendant BARRIOS.

103.  On August 23, 2012, in Hazard territory, defendant ORTIZ possessed a .38 caliber Smith & Wesson model 36 revolver and ammunition.

104.  On August 25, 2012, using coded language in a telephone conversation, defendants M. MORALES and BARRIOS discussed Hazard activity including: that defendants DORAN and MIRANDA had assaulted someone in prison; that defendant DORAN wanted someone in Hazard territory to be assaulted for using

1  defendant DORAN's name inappropriately; and reviewing defendant
2  ORTIZ's "paperwork."

3      105. On August 25, 2012, using coded language in a
4  telephone conversation, defendant BARRIOS directed defendant
5  SALGADO to get a weapon from defendant RUIZ, and defendant
6  BARRIOS expressed his suspicion that someone was providing
7  information to law enforcement.

8      106. On August 26, 2012, using coded language in a
9  telephone conversation, defendants BARRIOS and M. MORALES
10 discussed whether a Hazard associate was a possible cooperator,
11 that defendant DORAN planned to assault the individual, and that
12 defendant BARRIOS planned to put money in defendant DORAN's
13 prison account.

14     107. On August 27, 2012, using coded language in several
15 telephone conversations, defendants BARRIOS, MONTES, and JACKSON
16 discussed assaulting a sureño who they suspected of cooperating
17 with law enforcement.

18     108. On August 27, 2012, using coded language in a
19 telephone conversation, defendant MONARREZ ordered
20 methamphetamine from defendant BARRIOS.

21     109. On August 28, 2012, using coded language in a
22 telephone conversation, defendant JOHNSON discussed the quality
23 of his drugs with a Hazard member and associate.

24     110. On August 29, 2012, using coded language in a
25 telephone conversation, defendant MONTES informed defendant
26 BARRIOS that he was getting a firearm.

27     111. On August 31, 2012, using coded language in a
28 telephone conversation, defendants JOHNSON and PAGAN discussed

1  defendant JOHNSON not being able to get to a stash of drugs

2  because of the presence of law enforcement.

3  112. On August 31, 2012, defendant BARRIOS directed

4  defendant MONTES to a location in rival gang territory and

5  instructed defendant MONTES and others to shoot at the location.

6  113. On September 1, 2012, using coded language in a

7  telephone conversation, defendants BARRIOS and M. MORALES

8  discussed rival gangs and defendant RUIZ getting a firearm.

9  114. On September 1, 2012, defendant MONTES and other

10 Hazard associates possessed a loaded Glock model 26 9mm pistol

11 with an extra loaded magazine while driving through rival gang

12 territory.

13 115. On September 2, 2012, using coded language in a

14 telephone conversation, defendants BARRIOS and MONTES discussed

15 whether there were individuals cooperating with law enforcement

16 and whether law enforcement had a "wire" on them, at which time

17 defendant BARRIOS advised that defendant JACKSON had directed

18 them to lay low.

19 116. On September 5, 2012, using coded language in a

20 telephone conversation, defendants BARRIOS and M. MORALES

21 discussed whether a rival gang currently had a "green light" and

22 defendant BARRIOS indicated that he would confirm the existence

23 of the "green light" with defendant JACKSON.

24 117. On September 10, 2012, using coded language in a

25 telephone conversation, defendants BARRIOS and M. MORALES

26 discussed getting PCP from defendant AMEZCUA.

27

28

118. On September 11, 2012, using coded language in a telephone conversation, defendant BARRIOS told a Hazard associate that firearms were available for use by Hazard.

119. On September 12, 2012, using coded language in a telephone conversation, defendant BARRIOS directed defendant MONTES to pass a message to Hazard members and associates that defendant MIRANDA was to be disciplined for using defendant JACKSON's name inappropriately.

120. On September 13, 2012, using coded language in a telephone conversation, defendant BARRIOS told defendant MONTES that defendant HUERTA, while driving a stolen car, was stopped by law enforcement, and defendants BARRIOS and MONTES discussed the possibility of someone cooperating with law enforcement.

121. On September 13, 2012, using coded language in a telephone conversation, defendant RIVERA told defendant BARRIOS that she assaulted a female in Hazard territory who improperly invoked Hazard's name.

122. On September 14, 2012, using coded language in a telephone conversation, defendant BARRIOS asked defendant M. MORALES to establish a connection with associates in a prison yard in order to relay messages.

123. On September 14, 2012, using coded language in telephone conversations, defendants BARRIOS, HUERTA, MONARREZ, and M. MORENO discussed confronting an individual suspected of invoking a Hazard member's name inappropriately.

124. On September 18, 2012, using coded language in a telephone conversation, defendants MONTES and BARRIOS discussed

going into a rival gang's neighborhood to retaliate for

perceived violations of sureño rules.

125. On September 19, 2012, using coded language in a

telephone conversation, defendant BARRIOS told defendant SALAS

that messages to defendant JACKSON had to go through defendant

BARRIOS or defendant AMEZCUA and that defendant SALAS could send

messages to unindicted co-conspirator Piña through defendant

J. LIZARRAGA.

126. On September 19, 2012, using coded language in

telephone conversations, defendant BARRIOS informed defendants

PAGAN and HUERTA that he had a supply of drugs.

127. On September 19, 2012, using coded language in a

telephone conversation, defendants MONARREZ and BARRIOS

discussed Hazard business including that: defendant BARRIOS

wanted to talk with the young members in the RG Boys clique

about attracting the attention of law enforcement ("drawing

heat"); rival gang members had been in Hazard territory;

defendant SALGADO had been disciplined for breaking Hazard

rules; defendant MIRANDA had been looking for a particular

individual to assault and defendant MONARREZ may have to assault

the individual for defendant MIRANDA; and defendant ORTIZ's

"paperwork" had been reviewed and he was "cleared."

128. On September 19, 2012, using coded language in a

telephone conversation, defendants HUERTA and BARRIOS discussed

changing vehicle identification numbers on stolen cars.

129. On September 19, 2012, using coded language in a

telephone conversation, defendants BARRIOS and SALAS discussed

Hazard business, including that the younger members were "drawing heat" and would need to be disciplined.

130. On September 19, 2012, using coded language in a telephone conversation, defendants BARRIOS and M. MORALES discussed that defendant BARRIOS possessed drugs that he could not distribute because of law enforcement's presence in Hazard territory.

131. On September 19, 2012, using coded language in a telephone conversation, defendant BARRIOS passed a message to defendant AMEZCUA from defendant JACKSON that a sureño did not have authority to meet with defendant JACKSON.

132. On September 20, 2012, using coded language in a telephone conversation, defendant BARRIOS told a Hazard associate that he suspected that someone was cooperating with law enforcement.

133. On September 22, 2012, defendant RIVERA possessed approximately 45.5 grams of methamphetamine for sale, along with a digital scale used for drug distribution, and utilized a live-feed surveillance camera connected to a monitor inside of her residence so that she could be alerted to the presence of drug customers and approaching law enforcement.

134. On October 1, 2012, using coded language in a telephone conversation, defendant RIVERA told defendant BARRIOS that she had "paperwork" on possible cooperators who she suspected were responsible for a recent search at her residence.

135. On October 3, 2012, defendant JOHNSON possessed approximately 110 grams of methamphetamine for sale, along with a letter from a Hazard member or associate in prison who had

1  asked defendant JOHNSON to pass messages to defendant JACKSON

2  regarding an inmate suspected of violating sureño rules.

3       136. On October 3, 2012, defendant BARRIOS, in coded

4  language in a telephone conversation, received a warning from a

5  Hazard associate that defendant JOHNSON had been arrested and

6  that defendant BARRIOS should not call defendant JOHNSON's

7  phone.

8       137. On October 4, 2012, defendant SALAS, in coded language

9  in a telephone conversation, told defendant BARRIOS that a law

10  enforcement officer had a "green light."

11       138. On October 19, 2012, in coded language in a telephone

12  conversation, a Hazard member or associate asked defendant

13  BARRIOS for gun silencers.

14       139. On November 9, 2012, defendants BARRIOS, HUERTA,

15  MONARREZ, A. MORALES, M. MORALES, and ORTIZ, along with other

16  Hazard members, held a "jump in" for a new Hazard clique, RG

17  Boys.

18       140. On November 11, 2012, in coded language in a telephone

19  conversation, defendant MONARREZ reported to defendant BARRIOS

20  that rival gang members had "tagged" in Hazard territory.

21       141. On November 19, 2012, defendant BARRIOS collected a

22  $100 "tax" from a CI on behalf of Hazard.

23       142. On December 4, 2012, defendants FLORES and HUERTA sold

24  approximately 8.7 grams of methamphetamine for $200 to a CI.

25       143. On December 27, 2012, defendant JACKSON sent a portion

26  of the collected Hazard "taxes" to unindicted co-conspirator

27  Reynoso.

28

42

144. On January 5, 2013, defendant LOPEZ possessed approximately 19 grams of methamphetamine for sale, along with a digital scale and a loaded .380 caliber Smith & Wesson pistol, model SW380.

145. On January 31, 2013, using coded language in a telephone conversation, defendant HUERTA told defendant SALAS that he had collected a "tax" on behalf of Hazard and would take it to defendant SALAS.

146. On January 31, 2013, using coded language in a telephone conversation, defendant RIVERA ordered methamphetamine from defendant BARRIOS, who relayed that he would deliver it to defendant RIVERA in Hazard territory, and defendant BARRIOS asked defendant RIVERA to let him know if law enforcement was around.

147. On February 1, 2013, using coded language in a telephone conversation, defendants HUERTA and M. MORALES discussed collecting "taxes" from other gang members and whether Ramona Gardens residents were cooperating with law enforcement.

148. On February 2, 2013, using coded language in a telephone conversation, defendant BARRIOS asked a Hazard associate about acquiring firearms.

149. On February 3, 2013, defendant FLORES delivered drugs to defendant HUERTA, and, later that day, using coded language in a telephone conversation, they discussed the quality of the drugs and defendant FLORES's manufacturing method.

150. On February 4, 2013, defendant SMITH delivered a $100 "tax" to defendant HUERTA on behalf of Hazard.

151. On February 4, 2013, using coded language in a telephone conversation, defendant HUERTA asked defendant SALAS to acquire a supply of PCP.

152. On February 4, 2013, using coded language in a telephone conversation, defendant SALGADO reported to defendant BARRIOS that he and other Hazard members and associates had assaulted a non-gang member for cooperating with law enforcement.

153. On February 5, 2013, using coded language in a telephone conversation, defendant HUERTA contacted other Hazard members, including defendant FLORES, in an effort to locate a firearm for sale for defendant SMITH.

154. On February 5, 2013, using coded language in a telephone conversation, defendants BARRIOS and SMITH discussed defendant BARRIOS selling defendant SMITH a handgun for $500.

155. On February 5, 2013, using coded language in a telephone conversation, defendant BARRIOS told a Hazard associate calling from prison that he had heroin available.

156. On February 10, 2013, defendant MONTES provided defendant BARRIOS with ammunition for use in a retaliatory mission against a rival gang and instructed defendant BARRIOS to wipe any fingerprints from the ammunition before using it in the attack.

157. On February 10, 2013, defendants BARRIOS and HUERTA, using coded language in a telephone conversation, discussed getting methamphetamine and retaliating against a rival gang.

44

158. On February 10, 2013, using coded language in a telephone conversation, defendant J. LIZZARAGA asked defendant HUERTA if he needed a supply of PCP.

159. On February 11, 2013, defendant BARRIOS, using coded language in telephone conversations, told defendants SALGADO and A. MORALES that he heard that law enforcement was going "to do a sweep," and further told defendant SALGADO that surveillance cameras were in Ramona Gardens, and that defendant SALGADO needed to relay to Hazard members and associates to lay low.

160. On February 12, 2013, using coded language in a telephone conversation, defendant HUERTA ordered methamphetamine from defendant SALAS.

161. On February 12, 2013, using coded language in a telephone conversation, defendant BARRIOS directed a Hazard member in prison to contact defendant AMEZCUA to report an inmate sureño who was perceived as violating sureño rules.

162. On February 12, 2013, using coded language in a telephone conversation, defendant HUERTA asked to use the firearm that defendant SMITH had acquired to commit a robbery.

163. On February 12, 2013, using coded language in a telephone conversation, defendant M. MORALES discussed with a Hazard member in prison the need to assault a sureño who was perceived as violating sureño rules.

164. On February 15, 2013, using coded language in a telephone conversation, defendant BARRIOS asked defendant MARTINEZ when he would pay his "tax."

165. On February 15, 2013, using coded language in a telephone conversation, defendants BARRIOS and SALGADO discussed holding a Hazard meeting that day.

166. On February 17, 2013, defendant BARRIOS delivered guns to defendant SALGADO.

167. On February 18, 2013, using coded language in a telephone conversation, defendants SALAS and HUERTA discussed a resident in Hazard territory who they believed needed to be assaulted for communicating with law enforcement.

168. On February 18, 2013, using coded language in a telephone conversation, defendant SALGADO confirmed with defendant BARRIOS that the collected "taxes" were going to defendant BARRIOS on behalf of Hazard.

169. On February 20, 2013, defendant J. HERNANDEZ and a Hazard associate, using coded language in a telephone conversation, ordered an ounce of methamphetamine from defendant HUERTA.

170. On February 20, 2013, using coded language in a telephone conversation, defendant HUERTA reported to defendant PAGAN that defendant M. MORALES had ordered four ounces of methamphetamine.

171. On February 21, 2013, using coded language in telephone conversations, defendant HUERTA ordered PCP from defendant SALAS and discussed the need to discipline defendant RODRIGUEZ for carelessly attracting the attention of law enforcement.

172. On February 23, 2013, defendants BARRIOS and MONTES, using coded language in a telephone conversation, discussed

46

whether Hazard associates were providing information to law enforcement.

173. On February 25, 2013, using coded language in a telephone conversation, defendants HUERTA and FLORES discussed using a cutting agent to increase the volume of methamphetamine for sale.

174. On February 23, 2013, using coded language in a telephone conversation, defendant SALGADO asked defendant BARRIOS for a firearm.

175. On February 26, 2013, using coded language in telephone conversations, defendant HUERTA asked defendant FLORES for a pound of drugs and later threatened to rob the drug source if the drugs were not provided.

176. On February 27, 2013, using coded language in a telephone conversation, defendant HUERTA explained to a Hazard member that RG Boys had joined Hazard, that the Little Diablos was the newest clique in Hazard, and that the Little Diablos clique was active ("putting in work") in Hazard.

177. On February 28, 2013, using coded language in a telephone conversation, defendant SALAS reported to defendant HUERTA that someone was installing cameras in Hazard territory, and defendant HUERTA told defendant SALAS that he was going to tear the cameras down.

178. On February 28, 2013, using coded language in telephone conversations, defendants SALAS, HUERTA, and M. MORALES discussed whether defendant A. MORALES had been selling methamphetamine to defendant HUERTA's customers.

179. On February 28, 2013, using coded language in telephone conversations, defendants BARRIOS and DORAN discussed Hazard activity, including that a rival gang had a "green light;" that defendant BARRIOS suspected that others were providing information to law enforcement; that defendant DORAN would assault those who cooperated with law enforcement; and that defendant BARRIOS had heroin available for smuggling into prison.

180. On March 1, 2013, using coded language in a telephone conversation, defendants HUERTA and PAGAN discussed obtaining methamphetamine from defendant SALAS for distribution.

181. On March 1, 2013, using coded language in a telephone conversation, defendant FLORES, using defendant HUERTA's telephone, took drug orders from customers for defendant HUERTA.

182. On March 1, 2013, defendant BARRIOS used defendant MONTES's car to drive into Ramona Gardens because defendant BARRIOS's car was stolen and would be detected by law enforcement.

183. On March 1, 2013, defendant SMITH and other Hazard members possessed a loaded 9mm Sig Sauer semi-automatic firearm while driving through Hazard territory in a stolen car.

184. On March 1, 2013, defendant MONARREZ, using coded language in telephone conversations, reported to defendant BARRIOS that defendant SMITH and others had been stopped by law enforcement in a stolen car, and defendant BARRIOS asked about the location of the firearm defendant SMITH and the other Hazard members in the car possessed.

185. On March 29, 2013, defendant J. HERNANDEZ, in Hazard territory, sold approximately 14 grams of methamphetamine for $550 to a CI.

186. On April 19, 2013, using coded language in a telephone conversation, defendant JACKSON contacted another Mexican Mafia member and set up a meeting to discuss a sureño gang not paying "taxes" appropriately.

187. On April 19, 2013, using coded language in a telephone conversation, defendant JACKSON discussed with another Mexican Mafia member the payment of a drug debt.

188. On April 26, 2013, using coded language in a telephone conversation, defendant BARRIOS told defendant JACKSON that defendant MONTES had just been released from custody and was providing messages to defendant BARRIOS to pass to defendant JACKSON.

189. On April 28, 2013, using coded language in a telephone conversation, defendant JACKSON reprimanded defendant LOPEZ for collecting "taxes" for drug debts from individuals in prison without defendant JACKSON's permission.

190. On April 29, 2013, defendants JACKSON, LOPEZ, and BARRIOS met to discuss the collection of "taxes" for and on behalf of Hazard.

191. On May 2, 2013, using coded language in a telephone conversation, defendant JACKSON asked defendant LOPEZ to meet to deliver drugs and to receive messages from defendant JACKSON for defendant LOPEZ to deliver to Hazard members and associates in custody.

49

192. On May 3, 2013, using coded language in a telephone conversation, defendant JACKSON directed defendant BARRIOS to meet with defendant LOPEZ who was delivering drugs for defendant JACKSON that day.

193. On May 12, 2013, using coded language in a telephone conversation, defendant JACKSON directed defendant BARRIOS to get the Hazard "tax" money together to deliver to defendant JACKSON that day.

194. On August 13, 2013, defendant RODRIGUEZ, in Hazard territory, sold approximately 23.9 grams of methamphetamine for $800 to a CI.

195. On September 19, 2013, defendant RODRIGUEZ, in Hazard territory, sold approximately 45.9 grams of methamphetamine for $1,600 to a CI.

196. On September 19, 2013, using coded language in a telephone conversation, defendant JACKSON instructed defendant AMEZCUA that any "tax" money going to defendant JACKSON must first go through defendant AMEZCUA.

197. On October 26, 2013 Hazard members and associates vandalized property throughout Hazard territory by spray-painting Hazard signs and symbols on multiple walls.

198. On December 13, 2013, using coded language in a telephone conversation, defendant JACKSON told defendant AMEZCUA that AMEZCUA and defendants BARRIOS and SALAS would be receiving a smuggled letter from prison containing gang messages.

199. On December 13, 2013, using coded language in a telephone conversation, defendant JACKSON told defendant AMEZCUA

50

that an individual who was suspected of cooperating with law enforcement was out of custody.

200. On March 18, 2014, defendant RUIZ, in Hazard territory, sold approximately 6.6 grams of methamphetamine for $240 to a CI.

201. On May 2, 2014, using coded language in a telephone conversation, defendant JACKSON told defendant AMEZCUA the prison facility where an individual who was suspected of cooperating with law enforcement was being housed while in custody.

202. On May 23, 2014, defendant BARRIOS, in Hazard territory, possessed cocaine, methamphetamine, heroin, and a .40 caliber Glock firearm with a loaded magazine.

203. On May 28, 2014, using coded language in a telephone conversation, defendant JACKSON directed defendant AMEZCUA to contact Hazard members and associates to let them know that defendant BARRIOS had been arrested and that defendant AMEZCUA was the new main contact defendant JACKSON would utilize.

204. On June 20, 2014, using coded language in a telephone conversation, defendant JACKSON told defendant AMEZCUA the name of an individual who was cooperating with law enforcement and directed defendant AMEZCUA to let Hazard members and associates know to assault this individual.

205. On June 21, 2014, defendant ORTIZ and other Hazard members and associates possessed stolen cars in Hazard territory.

206. In August 2014, defendant MIRANDA, while in custody, had photos taken of himself displaying Hazard gang signs.

51

207. On August 14, 2014, defendant M. MORALES possessed heroin in Hazard territory.

208. On October 21, 2014, Hazard members threatened the murder of members of law enforcement and of individuals cooperating with law enforcement by spray painting, "187 on Cops, Big Hazard" and "187 Ratas."

1                         SPECIAL SENTENCING ALLEGATIONS

2          THE GRAND JURY FURTHER ALLEGES THAT:

3          1.    Beginning on a date unknown, and continuing to on or

4     about December 3, 2014, in Los Angeles County, within the

5     Central District of California, and elsewhere, defendants

6     JACKSON, BARRIOS, JOHNSON, HUERTA, AMEZCUA, A. HERNANDEZ, DORAN,

7     J. LIZARRAGA, SANDOVAL, SALAS, MONTES, M. MORALES, FLORES,

8     MIRANDA, LOPEZ, WETMORE, MARTINEZ, PAGAN, IBARRA, SALGADO,

9     A. MORALES, SMITH, MONARREZ, ORTIZ, J. HERNANDEZ, RODRIGUEZ,

10    RUIZ, J. GONZALEZ, RIVERA, and others known and unknown to the

11    Grand Jury, conspired and agreed with each other to knowingly

12    and intentionally distribute, and possess with intent to

13    distribute, at least 50 grams of methamphetamine, a Schedule II

14    controlled substance, in violation of Title 21, United States

15    Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

16         All in violation of Title 18, United States Code, Section

17    1962(d).

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. § 1959(a)(3)]

1.   Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

2.   At all times relevant to this Indictment, Hazard, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, although not a legal entity, which was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.   At all times relevant to this Indictment, Hazard, through its leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, robbery, and extortion, in violation of the California Penal Code; acts involving the possession with intent to distribute, conspiracy to distribute, and the distribution of controlled substances, including heroin, methamphetamine, PCP, cocaine, and cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and acts indictable under Title 18, United States Code, Section 1951 (extortion).

4.   On or about September 2, 2010, in Los Angeles County, within the Central District of California, for the purpose of

54

1 maintaining and increasing position in Hazard, an enterprise

2 engaged in racketeering activity, defendant MARK ANTHONY

3 JOHNSON, also known as "Boo Boo," assaulted with a dangerous

4 weapon an unidentified victim, in violation of California Penal

5 Code Section 245(a)(1).

6     All in violation of Title 18, United States Code, Section

7 1959(a)(3).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THREE

[18 U.S.C. § 1959(a)(5)]

1.   Paragraphs 1 through 3 of Count Two are re-alleged and incorporated by reference as if fully set forth herein.

2.   Beginning on an unknown date, and continuing until on or about September 1, 2012, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Hazard gang, an enterprise engaged in racketeering activity, defendants MANUEL LARRY JACKSON, also known as ("aka") "Cricket," VICTOR BARRIOS, aka "Grizzly," aka "Ghost," RAYMOND MONTES, aka "Baby," and others known and unknown to the Grand Jury, conspired to murder rival gang members, in violation of California Penal Code Sections 182, 187, and 189.

All in violation of Title 18, United States Code, Section 1959(a)(5).

COUNT FOUR

[21 U.S.C. § 846]

1.    Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

1.    Beginning on a date unknown, and continuing to on or about December 3, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants JACKSON, BARRIOS, JOHNSON, HUERTA, AMEZCUA, A. HERNANDEZ, DORAN, J. LIZARRAGA, SANDOVAL, SALAS, MONTES, M. MORALES, FLORES, MIRANDA, LOPEZ, WETMORE, MARTINEZ, PAGAN, IBARRA, SALGADO, A. MORALES, SMITH, MONARREZ, ORTIZ, J. HERNANDEZ, RODRIGUEZ, RUIZ, J. GONZALEZ, RIVERA, ALEX PADILLA, aka "Flaco" ("PADILLA"), DAVID NUNEZ, aka "Gordo" ("NUNEZ"), MARIO LIZARRAGA ("M. LIZARRAGA"), LEON ABEL GONZALEZ ("L. GONZALEZ"), JAVIER GUTIERREZ ("GUTIERREZ"), GELACIO TREJO ("TREJO"), PEDRO GUZMAN, aka "Moreno," aka "Negro" ("GUZMAN"), MONIQUE CASTILLO ("CASTILLO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute, and possess with intent to distribute, controlled substances, including heroin, a Schedule I narcotic drug controlled substance; cocaine, a Schedule II narcotic drug controlled substance; cocaine base in the form of crack cocaine, a Schedule II narcotic drug controlled substance; and PCP, a Schedule II controlled substance, each in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and the following controlled substances:

1              a.    at least 50 grams of methamphetamine, a Schedule

2    II controlled substance, in violation of Title 21, United States

3    Code, Sections 841(a)(1) and 841(b)(1)(A)(viii); and

4              b.    at least five grams of methamphetamine, a

5    Schedule II controlled substance, in violation of Title 21,

6    United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

7    B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

8         ACCOMPLISHED

9         1-4.   The Grand Jury re-alleges and incorporates by

10   reference as if fully set forth herein paragraphs 1 through 4 of

11   Section B of Count One of this Indictment.

12        5.    Defendants PADILLA, NUNEZ, M. LIZARRAGA, L. GONZALEZ,

13   GUTIERREZ, TREJO, GUZMAN, and CASTILLO would provide, and assist

14   Hazard members and associates in obtaining, controlled

15   substances for further distribution.

16   C.   OVERT ACTS

17        In furtherance of the conspiracy, and to accomplish the

18   objects of the conspiracy, on or about the following dates,

19   defendants JACKSON, BARRIOS, JOHNSON, HUERTA, AMEZCUA,

20   A. HERNANDEZ, DORAN, J. LIZARRAGA, SANDOVAL, SALAS, MONTES,

21   M. MORALES, FLORES, MIRANDA, LOPEZ, WETMORE, MARTINEZ, PAGAN,

22   IBARRA, SALGADO, A. MORALES, SMITH, MONARREZ, ORTIZ,

23   J. HERNANDEZ, RODRIGUEZ, RUIZ, J. GONZALEZ, RIVERA, PADILLA,

24   NUNEZ, M. LIZARRAGA, L. GONZALEZ, GUTIERREZ, TREJO, GUZMAN,

25   CASTILLO, and others known and unknown to the Grand Jury,

26   committed various overt acts within the Central District of

27   California, and elsewhere, including but not limited to the

28   following:

1-208. The Grand Jury re-alleges and incorporates by reference as if fully set forth herein paragraphs 1 through 208 of Section C of Count One of this Indictment.

209. On February 22, 2011, defendant GUZMAN sold approximately 28.8 grams of methamphetamine for $1,600 to a CI.

210. On April 14, 2011, defendants GUZMAN and TREJO sold approximately 54.1 grams of methamphetamine for $2,800 and also provided a sample of crack cocaine to a CI.

211. On May 12, 2011, defendants GUZMAN and TREJO sold approximately 55.2 grams of methamphetamine for $3,000 to a CI.

212. On July 21, 2011, defendant L. GONZALEZ possessed approximately 16 grams of methamphetamine, 2.7 grams of cocaine, and .79 grams of crack cocaine, along with a digital scale.

213. On November 3, 2011, using coded language in a telephone conversation, defendants PADILLA and JOHNSON discussed the quality of their current drug supply.

214. On November 16, 2011, using coded language in a telephone conversation, defendants JOHNSON and PADILLA discussed the quality of a recent drug shipment.

215. On November 19, 2011, using coded language in a telephone conversation, defendant PADILLA asked defendant JOHNSON to provide a sample of drugs to another gang member.

216. On May 16, 2012, defendant JOHNSON told a CI that he "ran out" of methamphetamine and referred the CI to defendant PADILLA, who told the CI that he could secure the methamphetamine.

217. On May 16, 2012, using coded language in a telephone conversation, defendants JOHNSON and PADILLA discussed the presence of law enforcement.

218. On May 25, 2012, using coded language in a telephone conversation, defendant PADILLA reported to defendant JOHNSON that certain drug customers did not like the quality of drugs PADILLA and JOHNSON had sold.

219. On May 30, 2012, using coded language in a telephone conversation, defendant PADILLA told defendant JOHNSON to supply sandwich bags and a scale to use for preparing drugs for distribution.

220. On August 29, 2012, using coded language in a telephone conversation, defendant PADILLA told a co-conspirator that he planned to get heroin for distribution.

221. On September 12, 2012, using coded language in a telephone conversation, defendant PADILLA ordered a supply of PCP from a co-conspirator.

222. On September 13, 2012, using coded language in a telephone conversation, defendant PADILLA told defendant NUNEZ that he had new drug customers.

223. On September 25, 2012, using coded language in a telephone conversation, defendant PADILLA ordered two ounces of methamphetamine from defendant NUNEZ.

224. On September 26, 2012, defendants PADILLA and NUNEZ sold approximately 54.9 grams of methamphetamine to a CI for $1,400.

225. On September 29, 2012, defendant NUNEZ delivered a pound of methamphetamine to defendant PADILLA.

226. On October 10, 2012, defendant NUNEZ possessed approximately 61.4 grams of methamphetamine for sale, along with a scale and baggies used for distribution.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about February 22, 2011, in Los Angeles County, within the Central District of California, defendant PEDRO GUZMAN, also known as ("aka") "Moreno," aka "Negro," knowingly and intentionally distributed at least five grams, that is, approximately 28.8 grams, of methamphetamine, a Schedule II controlled substance.

1

                              COUNT SIX

2            [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3        On or about March 3, 2011, in Los Angeles County, within

4   the Central District of California, defendant LUCIO SANDOVAL,

5   also known as "Bouncer," knowingly and intentionally distributed

6   at least 50 grams, that is, approximately 55.2 grams, of

7   methamphetamine, a Schedule II controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about April 14, 2011, in Los Angeles County, within the Central District of California, defendants PEDRO GUZMAN, also known as ("aka") "Moreno," aka "Negro," and GELACIO TREJO, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 54.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about May 2, 2011, in Los Angeles County, within the Central District of California, defendants MARK ANTHONY JOHNSON, also known as ("aka") "Boo Boo," LUCIO SANDOVAL, aka "Bouncer," and MONIQUE CASTILLO, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 78.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about May 5, 2011, in Los Angeles County, within the Central District of California, defendant ART HERNANDEZ, also known as ("aka") "Comamo," knowingly and intentionally distributed at least five grams, that is, approximately 5.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about May 12, 2011, in Los Angeles County, within the Central District of California, defendants PEDRO GUZMAN, also known as ("aka") "Moreno," aka "Negro," and GELACIO TREJO, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 55.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about May 17, 2011, in Los Angeles County, within the Central District of California, defendants MARK ANTHONY JOHNSON, also known as ("aka") "Boo Boo," aka "Fat Boy," and ART HERNANDEZ, aka "Comamo," each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 84.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about June 16, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as "Comamo," and JAVIER GUTIERREZ, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 84.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about July 21, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as "Comamo," and LEON ABEL GONZALEZ, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 84.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about July 21, 2011, in Los Angeles County, within the Central District of California, defendant LEON ABEL GONZALEZ knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 16 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about August 25, 2011, in Los Angeles County, within the Central District of California, defendant FRANCISCO HUERTA, also known as "Cisco," knowingly and intentionally distributed approximately 3.9 grams of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about September 1, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as "Comamo," and JAVIER GUTIERREZ, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 54.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about September 7, 2011, in Los Angeles County, within the Central District of California, defendant FRANCISCO HUERTA, also known as "Cisco," knowingly and intentionally distributed approximately 3.6 grams of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about October 13, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as "Comamo," and LEON ABEL GONZALEZ, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 55.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about October 19, 2011, in Los Angeles County, within the Central District of California, defendant MARIO WETMORE, also known as "Lil Mario," knowingly and intentionally distributed approximately 2.9 grams of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about October 25, 2011, in Los Angeles County, within the Central District of California, defendant FRANCISCO HUERTA, also known as "Cisco," knowingly and intentionally distributed at least five grams, that is, approximately 6.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about November 2, 2011, in Los Angeles County, within the Central District of California, defendant MARIO WETMORE, also known as "Lil Mario," knowingly and intentionally distributed at least five grams, that is, approximately 28 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about November 10, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as "Comamo," and LEON ABEL GONZALEZ, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 217.9 grams, of methamphetamine, a Schedule II controlled substance.

1
2

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

3       On or about January 10, 2012, in Los Angeles County, within
4  the Central District of California, defendant MARK ANTHONY
5  JOHNSON, also known as "Boo Boo," knowingly and intentionally
6  distributed approximately 1.8 grams of methamphetamine, a
7  Schedule II controlled substance.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about January 25, 2012, in Los Angeles County, within the Central District of California, defendant JOSE LUIS LIZARRAGA, also known as "Night Owl," knowingly and intentionally distributed at least five grams, that is, approximately 13.9 grams of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about January 25, 2012, in Los Angeles County, within the Central District of California, defendant MARK ANTHONY JOHNSON, also known as "Boo Boo," knowingly and intentionally distributed at least five grams, that is, approximately 6.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 2(a)]

On or about February 16, 2012, in Los Angeles County, within the Central District of California, defendants JOSE LUIS LIZARRAGA, also known as "Night Owl," and MARIO LIZARRAGA, each intentionally aiding and abetting the other, knowingly and intentionally distributed at least five grams, that is, approximately 28.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about April 4, 2012, in Los Angeles County, within the Central District of California, defendants MANUEL LARRY JACKSON, also known as ("aka") "Cricket," and VICTOR BARRIOS, aka "Grizzly," aka "Ghost," each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 55.4 grams, of methamphetamine, a Schedule II controlled substance.

84

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about May 16, 2012, in Los Angeles County, within the Central District of California, defendant VICTOR BARRIOS, also known as ("aka") "Grizzly," aka "Ghost," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about May 25, 2012, in Los Angeles County, within the Central District of California, defendant VICTOR BARRIOS, also known as ("aka") "Grizzly," aka "Ghost," knowingly and intentionally distributed at least five grams, that is, approximately 27.2 grams, of methamphetamine, a Schedule II controlled substance.

1

2

COUNT THIRTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

3     On or about June 21, 2012, in Los Angeles County, within

4 the Central District of California, defendant ENRIQUE MARTINEZ,

5 also known as "Butter," knowingly and intentionally distributed

6 at least five grams, that is, approximately 6.9 grams, of

7 methamphetamine, a Schedule II controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 28, 2012, in Los Angeles County, within the Central District of California, defendant ALBERT MORALES, also known as "Lil Bronco," knowingly and intentionally distributed approximately 3.3 grams of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about July 9, 2012, in Los Angeles County, within the Central District of California, defendant VICTOR BARRIOS, also known as ("aka") "Grizzly," aka "Ghost," knowingly and intentionally distributed at least five grams, that is, approximately 24.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about September 26, 2012, in Los Angeles County, within the Central District of California, defendants ALEX PADILLA, also known as ("aka") "Flaco," and DAVID NUNEZ, aka "Gordo," each intentionally aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 54.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about October 3, 2012, in Los Angeles County, within the Central District of California, defendant MARK ANTHONY JOHNSON, also known as "Boo Boo," knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 110 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about October 10, 2012, in Los Angeles County, within the Central District of California, defendant DAVID NUNEZ, also known as "Gordo," knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 61.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 2(a)]

On or about December 4, 2012, in Los Angeles County, within the Central District of California, defendants FRANCISCO HUERTA, also known as ("aka") "Cisco," and OSCAR FLORES, aka "Zinc," each intentionally aiding and abetting the other, knowingly and intentionally distributed at least five grams, that is, approximately 8.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about March 29, 2013, in Los Angeles County, within the Central District of California, defendant JOSE HERNANDEZ knowingly and intentionally distributed at least five grams, that is, approximately 14 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT THIRTY-EIGHT

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

3          On or about August 13, 2013, in Los Angeles County, within

4     the Central District of California, defendant JESUS RODRIGUEZ,

5     also known as "Slave," knowingly and intentionally distributed

6     at least five grams, that is, approximately 23.9 grams, of

7     methamphetamine, a Schedule II controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about September 19, 2013, in Los Angeles County, within the Central District of California, defendant JESUS RODRIGUEZ, also known as "Slave," knowingly and intentionally distributed at least five grams, that is, approximately 45.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FORTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)]

On or about March 18, 2014, in Los Angeles County, within the Central District of California, defendant PEDRO RUIZ, also known as ("aka") "Minor," aka "Stretch," knowingly and intentionally distributed at least five grams, that is, approximately 6.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FORTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about August 14, 2014, in Los Angeles County, within the Central District of California, defendant MIGUEL MORALES, also known as "Moreno," knowingly and intentionally possessed with intent to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance.

COUNT FORTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about September 13, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as ("aka") "Comamo" ("HERNANDEZ") and DINO AGUILAR, aka "Sneaky" ("AGUILAR"), knowingly possessed a firearm, namely, a 9mm Parabellum Caliber semi-automatic pistol, Beretta model 92F, with an obliterated serial number, in and affecting interstate and foreign commerce.

Such possession occurred after defendant HERNANDEZ had been convicted of at least one of the following felonies, each punishable by a term of imprisonment exceeding one year, namely:

(1) Second Degree Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, Case Number BA059079, on or about December 15, 1992;

(2) Felon With a Firearm, in violation of California Penal Code Section 12021(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number BA092571, on or about April 12, 1994;

(3) Importation of Marijuana, in violation of Title 21 United States Code, Sections 952 and 960, in the United States District Court, Southern District of California, Case Number 99-CR-2774-K, on or about January 3, 2000.

Such possession occurred after defendant AGUILAR had been convicted of at least one of the following felonies, each punishable by a term of imprisonment exceeding one year, namely:

1       (1) Grand Theft, in violation of California Penal Code

2  Section 487(A), in the Superior Court for the State of

3  California, County of Los Angeles, Case Number VA080397, on or

4  about May 27, 2004;

5       (2) Possession of Narcotic Controlled Substance for Sale,

6  in violation of California Health & Safety Code Section 11351,

7  in the Superior Court for the State of California, County of Los

8  Angeles, Case Number VA084860, on or about November 1, 2004.

COUNT FORTY-THREE

[18 U.S.C. § 922(g)(1)]

On or about August 23, 2012, in Los Angeles County, within the Central District of California, defendant LUIS ORTIZ, also known as "Face" ("ORTIZ"), knowingly possessed a firearm, namely, a .38 caliber Smith and Wesson model 36 revolver, bearing serial number J890096, and ammunition, namely, four rounds of PMC .38 caliber ammunition, and one round of Federal .38 caliber ammunition, each in and affecting interstate and foreign commerce.

Such possession occurred after defendant ORTIZ had been convicted of at least one of the following felonies, each punishable by a term of imprisonment exceeding one year, namely, Vehicle Theft, in violation of California Vehicle Code 10851(A), and Evading a Peace Officer, in violation of California Vehicle Code 2800.2(A), in the Superior Court for the State of California, County of Los Angeles, Case Number BA378606, on or about December 8, 2010.

COUNT FORTY-FOUR

[18 U.S.C. §§ 924(c)(1)(A)(i), 2(a)]

On or about November 8, 2011, in Los Angeles County, within the Central District of California, defendants ART HERNANDEZ, also known as ("aka") "Comamo," and JESUS IBARRA, aka "Jesse," each intentionally aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed a firearm in furtherance of, a crime of violence, namely, conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One.

COUNT FORTY-FIVE

[18 U.S.C. §§ 924(c)(1)(A)(i), 2(a)]

On or about September 1, 2012, in Los Angeles County, within the Central District of California, defendants MANUEL LARRY JACKSON, also known as ("aka") "Cricket," VICTOR BARRIOS, aka "Grizzly," aka "Ghost," and RAYMOND MONTES, aka "Baby," each intentionally aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed a firearm in furtherance of, a crime of violence, namely, conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One, and violent crime in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Three.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Count One of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c).  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants charged in Count One that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this Indictment.

3.    Any and each defendant convicted of Count One of this Indictment:

a.    has acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.    has an interest in, security of, claims against, or property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims,

1 | or rights are subject to forfeiture to the United States
2 | pursuant to Title 18, United States Code, Section 1963(a)(2);
3 | and

4 |       c.   has property constituting or derived from
5 | proceeds obtained, directly and indirectly, from racketeering
6 | activity, in violation of Title 18, United States Code, Section
7 | 1962, which property is subject to forfeiture to the United
8 | States pursuant to Title 18, United States Code, Section
9 | 1963(a)(3), in the event of any defendant's conviction under
10 | Count One this Indictment.

11 |     4.   Pursuant to Title 18, United States Code, Section
12 | 1963(m), each defendant convicted of Count One of this
13 | Indictment shall forfeit substitute property, up to the value of
14 | the property described in paragraph 3, if, as the result of any
15 | act or omission of that defendant, the property described in
16 | paragraph 3, or any portion thereof (a) cannot be located upon
17 | the exercise of due diligence; (b) has been transferred, sold
18 | to, or deposited with a third party; (c) has been placed beyond
19 | the jurisdiction of the court; (d) has been substantially
20 | diminished in value; or (e) has been commingled with other
21 | property that cannot be divided without difficulty.

22 |     5.   Any defendant convicted of Count One of this
23 | Indictment, and each such defendant, is jointly and severally
24 | liable for the forfeiture obligations as alleged above.

25 |
26 |
27 |
28 |

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853]

1.    Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as thought fully set forth herein.

2.    The allegations contained in Counts Four through Forty-One are hereby repeated, re-alleged, and incorporated by reference herein as fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Section 853.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants charged in Counts Four through Forty-One that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853, in the event of any defendant's conviction under any of Counts Four through Forty-One of this Indictment.

3.    Pursuant to Title 21, United States Code, Section 853, any defendant convicted of any of the offenses set forth in Counts Four through Forty-One of this Indictment shall forfeit to the United States the following property:

        a.    All right, title, and interest in any and all property, real and personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

        b.    All right, title, and interest in any and all property, real and personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense; and

c.   A sum of money equal to the total value of the property described in subparagraphs 3(a) and (b) above.

4.   Pursuant to Title 21, United States Code, Section 853(p), the defendant convicted of any of Counts Four through Forty-One of this Indictment shall forfeit substitute property, if, by any act or omission of the defendant, the property described in paragraph 3, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

5.   If more than one defendant is convicted of any of the offenses set forth in Counts Four through Forty-One of the Indictment, each such defendant shall be jointly and severally liable for the entire amount ordered forfeited pursuant to that Count.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d), 26 U.S.C. § 5872, and 28 U.S.C. § 2461(c)]

1.   Paragraphs 1 through 21 of the General Allegations are re-alleged and incorporated by reference as though fully set forth herein.

2.   The allegations contained in Counts Forty-Two through Forty-Five of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 924(d), Title 26, United States Code, Section 5872, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under any of Counts Forty-Two through Forty-Five of this Indictment.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 924(d), Title 26, United States Code, Section 5872, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under any of Counts Forty-Two through Forty-Five of this Indictment.

3.   Upon any defendant's conviction under any of Counts Forty-Two through Forty-Five of this Indictment, such defendant shall forfeit to the United States any firearms and/or ammunition involved in, used, or received or possessed in the knowing commission of such offense.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

1  2461(c), each defendant convicted of any of Counts Forty-Two

2  through Forty-Five shall forfeit substitute property, up to the

3  value of the property described in paragraph 3, if, as the

4  result of any act or omission of that defendant, the property

5  described in the preceding paragraph, or any portion thereof

6  (a) cannot be located upon the exercise of due diligence;

7  (b) has been transferred, sold to, or deposited with a third

8  party; (c) has been placed beyond the jurisdiction of

9  //

10  //

1 | the court;  (d) has been substantially diminished in value; or

2 | (e) has been commingled with other property that cannot be

3 | divided without difficulty.

4

5

6                                              A TRUE BILL

7

8                                          /s/
                                           _____
                                           Foreperson

9 | STEPHANIE YONEKURA
10 | Acting United States Attorney

11

12 | ROBERT E. DUGDALE
    | Assistant United States Attorney
13 | Chief, Criminal Division

14 | KEVIN M. LALLY
    | Assistant United States Attorney
15 | Chief, Organized Crime Drug
    |    Enforcement Task Force Section
16

17 | JENNIFER L. WILLIAMS
    | Assistant United States Attorney
    | Deputy Chief, Organized Crime Drug
18 |    Enforcement Task Force Section

19 | VICKI CHOU
    | Assistant United States Attorney
20 | Organized Crime Drug Enforcement
    |    Task Force Section

21

22

23

24

25

26

27

28